## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Rocky Brands, Inc., et al.,**

**Plaintiffs,**

-v-                                              **Case No. 2:06-cv-00275**
                                                 **Judge Michael H. Watson**

**Red Wing Shoe Company, Inc., et al.,**

**Defendants.**

### OPINION AND ORDER

Plaintiffs in this action assert, inter alia, claims of false advertising and false
designation of origin under § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), and
the Ohio Deceptive Trade Practices Act ("ODTPA"). Defendants move for summary
judgment (Doc. 66) on the ground that plaintiffs' Lanham Act and ODTPA claims are
barred under the doctrine of laches. Defendants further argue the Court should decline
to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. For the
reasons that follow, the Court grants defendants' summary judgment motion in part and
denies it in part.

### I. Facts

Plaintiff Rocky Brands, Inc. ("Rocky Brands") is an Ohio corporation with its
principal place of business in Nelsonville, Ohio. Rocky Brands manufactures hunting
and work boots overseas, and markets and sells the boots throughout the United

States. Plaintiff Lehigh Safety Shoe Co. LLC ("Lehigh") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Nelsonville, Ohio. Lehigh manufactures work boots and shoes overseas, and markets and sells the boots and shoes nationwide. Rocky Brands acquired Lehigh in January 2005. The Court will refer to Rocky Brands and Lehigh collectively as "Rocky."

Defendant Red Wing Shoe Company, Inc. ("Red Wing Shoes") is a Minnesota corporation with its principal place of business in Red Wing, Minnesota. Red Wing Shoes manufactures hunting and work boots in the United States and overseas. It markets and sells its boots throughout the United States. Defendant Red Wing Brands of America, Inc. ("Red Wing Brands") is likewise a Minnesota corporation with its principal place of business in Red Wing, Minnesota. Red Wing Brands is the wholly-owned subsidiary of Red Wing Shoes. Red Wing Brands markets and sells boots manufactured by Red Wing Shoes. The Court will refer to Red Wing Shoes and Red Wing Brands collectively as "Red Wing."

Rocky alleges generally that Red Wing markets and advertises its boots in a manner that falsely suggests that all of Red Wing boots are made in the United States, when in fact some lines of Red Wing boots are manufactured overseas. Since the motion currently before the Court concerns only the defense of laches, and not the merits, the Court will forego a detailed recitation of Red Wing's alleged misconduct. Rather, the Court will focus on the facts germane to the doctrine of laches.

The parties dispute when Rocky first became aware of Red Wing's alleged false advertising. Red Wing asserts Rocky acquired knowledge of Red Wing's purported wrongful conduct sometime in 2001. Red Wing bases its assertion on the deposition

testimony of Rocky CEO Michael Brooks. The following colloquy took place during Mr.

Brooks' deposition:

> Q.  When did you first become aware that to you Red Wing Shoe
>     Company was engaging in unfair competition that was harming
>     Rocky?
>
> A.  Sometime in 2001.
>
> . . . .
>
> Q.  Okay. So what is it specifically, and I want to understand what it
>     was you believed in 2001 crossed the line and was unfair
>     competition or illegal that Red Wing was doing to Rocky?
>
> A.  I watched their advertising from a distance. . . . I watched their
>     shoes in their Red Wing stores and other stores. . . . And I saw a
>     consistent intentional, in my opinion, bait and switch, if you may
>     want to call it, that's what I'll call it, of China made product trying to
>     tie into the historical Red Wing brand and made in USA.

(Brooks Dep., pp. 244, 247-48).

Rocky asserts it first became aware of Red Wing's allegedly deceptive conduct

in the spring of 2003. Around March 2003, Rocky contacted its legal counsel and

retained investigators to record examples of Red Wing's alleged improper advertising.

Counsel met with the investigators in May 2003. The investigators then performed

inspections of various stores which sold Red Wing footwear. The investigation

continued through the summer of 2003. In September 2003, Rocky also reviewed

websites which used the "Made in USA" designation in connection with Red Wing's

boots.

On October 21, 2003, Rocky sent a letter to the Associate Director of

Enforcement for the Federal Trade Commission ("FTC"). Rocky included the findings of

its investigation with the letter.

On June 28, 2004, FTC staff attorney Laura Koss wrote a letter to Red Wing's

President and COO, David Murphy.  The letter stated in part:

> The Enforcement Division of the Federal Trade Commission's Bureau of
> Consumer Protection has received information alleging that certain Red
> Wing Shoe Company stores selling "Red Wing" and "Chippewa" brand
> boots have displayed signs, posters, door mats, and clocks stating "made
> in USA," even though some of the boots in the stores are actually
> imported.
>
> Because these signs and posters are not affixed to any particular boot or
> box but are either on the store windows or inside the store, the staff
> believes that they may give the impression that all the products in the
> store are in fact "Made in the USA" . . .
>
> Enclosed for your information please find a copy of our business guide
> entitled "Complying with the Made in USA Standard" . . .
>
> We urge Red Wing Shoe Company to take steps to ensure that its point-
> of-purchase displays, packaging, labeling, advertising and other marketing
> materials comply with Section 5 of the FTC Act, 15 U.S.C. § 45, and the
> Commission's "Made in USA" standard.
>
> The opinions expressed in this letter are those of the staff and not
> necessarily those of the Commission or of any Commissioner . . .

Ms. Koss did not send a copy of the letter to Rocky.  After receipt of the letter from the

FTC, Red Wing sent a letter to store managers warning them to avoid the improper use

of the "Made in USA" designation and the need to comply with FTC regulations.

On September 30, 2004, Rocky sent a second letter to the FTC, requesting an

update and recommending that the FTC devote more resources to Rocky's complaint.

Rocky included with the letter a Wall Street Journal Article with the headline, "*Red Wing

Digs In Its Heels to Fight Chains and Imports: Bootmaker Updates Its Looks, But is Still

'Made in the USA.'*" An FTC investigator responded with a letter dated October 21,

2004, thanking Rocky for its second letter and indicating the matter would be given

careful attention. The FTC apparently took no further action on the matter.

On November 1, 2005, Mr. Brooks wrote a cease and desist letter to Red Wing. The letter indicated Brooks' hope that "this matter can be settled in an amicable fashion." The letter requested a response "no later than two weeks from the date of this letter."

On November 29, 2005, Red Wing's Vice President and General Counsel, David Baker, responded in writing to Mr. Brooks' cease and desist letter. Mr. Baker indicated in his letter to Rocky that Red Wing was in compliance with the FTC's "Made in America" standard. Mr. Baker also denied that Red Wing had engaged in deceptive advertising or marketing as Rocky had asserted.

Rocky filed the instant lawsuit on April 14, 2006, seeking damages back to 2001 as well as injunctive relief.

## II. Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides in pertinent part:

> The judgment sought shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely

"'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting
Matsushita, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to
establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is,
the nonmoving party has an affirmative duty to direct the court's attention to those
specific portions of the record upon which it seeks to rely to create a genuine issue of
material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. Discussion

Red Wing argues the doctrine of laches bars Rocky's Lanham Act and ODTPA
claims. Rocky maintains that the laches doctrine does not apply to this case, and that,
even if it does, Rocky's delay in filing is excusable.

### A. Presumption of laches

The Lanham Act does not include a statute of limitations. *Tandy Corp. V.
Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985). Consequently, courts have
applied the equitable doctrine of laches to determine whether a Lanham Act claim may
be barred on the basis of a delay in filing. *Id.* The Sixth Circuit Court of Appeals has
defined laches as the "negligent and unintentional failure to protect one's rights." *Id.* To
succeed on the laches defense, a defendant must demonstrate: (1) the plaintiff failed to
diligently protect its rights under the Lanham Act; and (2) the defendant suffered
prejudice as a result. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th
Cir. 2002).

The starting point of the laches analysis is the analogous statute of limitations of

the forum state. *Id.* If the lawsuit was filed before the analogous statute of limitations lapsed, there is a strong presumption that the delay in filing was reasonable. *Id.*; *Tandy,* 769 F.2d at 366. If, however, the action was not brought within the period provided by the state statute of limitations, a strong presumption arises that the delay was prejudicial and unreasonable. *Nartron,* 305 F.3d at 408; *Tandy,* 769 F.2d at 366. The applicable period begins to run when the plaintiff has actual or constructive knowledge of the conduct which allegedly violates the plaintiff's rights under the Lanham Act. *Nartron,* 305 F.3d at 408. The analogous state statute of limitations for a Lanham Act claim of false advertising is the two-year limitations period in Ohio Rev. Code § 2305.10, which applies to claims of bodily injury or damage to personal property. *Logan Farms v. HBH, Inc. DE,* 282 F. Supp.2d 776, 790 (S.D. Ohio 2003).

Here, Red Wing argues it is entitled to the presumption of prejudice because Rocky first became aware of Red Wing's alleged deceptive advertising in 2001, but Rocky waited until April 14, 2006 to file the instant lawsuit. Specifically, Red Wing points to the deposition testimony of Rocky CEO, Mr. Brooks, who indicated he first became aware of Red Wing's wrongful conduct in 2001. Mr. Brooks described Red Wing's conduct in 2001 as "bait and switch, if you may want to call it, that's what I'll call it of China made product trying to tie into the historical Red Wing brand and made in USA." (Brooks Dep p. 248). Red Wing also points out the striking similarity between the factual allegations set forth in Rocky's October 21, 2003 letter to the FTC and the facts asserted in Rocky's April 14, 2006 complaint in the instant case.

Rocky contends that Mr. Brooks' testimony concerning when he first learned of Red Wing's alleged unlawful conduct consists of vague and uncertain approximations

or "guesstimates." (Brooks Dep. (May 8, 2008) p. 347). Rocky relies on the following colloquy in asserting that Mr. Brooks' testimony consisted of 'guesstimates":

Q.  We last – when we last talked, I recall that you mentioned in 2001 was when you first started looking at Red Wing about what they were doing. When did you first either call or write or contact any elected government representative or government agency about Red Wing?

A.  The exact time, I – I have – I'm going to – I'm going to guesstimate it was somewhere in the time frame of 2002 or possibly 2003.

(Brooks Dep. (May 8, 2008) pp. 346-47).

The Court will not ignore Mr. Brooks' testimony that sometime in 2001 he became aware of Red Wing's allegedly wrongful conduct. Notably, Mr. Brooks did not attempt to qualify his testimony on this particular point. Indeed, counsel asked Mr. Brooks several other questions concerning the 2001 time frame, and Mr. Brooks had multiple opportunities to modify or qualify his reference to that date. He did not do so. Moreover, the testimony Rocky relies upon to show that Mr. Brooks was speaking in terms of "guesstimates" does not even relate to when Mr. Brooks initially became aware of the alleged deceptive advertising and marketing. It is simply not reasonable to infer that because Mr. Brooks was uncertain about one date that he was equally uncertain about other dates. Furthermore, Mr. Brooks' "guesstimate" that he first contacted a government official about the matter in 2002 or 2003 is, in any event, consistent with his testimony that he learned of Red Wing's alleged unfair competition in 2001 considering he also stated that after he discovered Red Wing's wrongful conduct in 2001, "[f]or quite a while, I just watched it from a distance." (Brooks Dep. p. 248).

Rocky also maintains that the Court should accept the response Rocky gave to

Red Wing's interrogatory on the subject, which indicates Rocky initially became aware of Red Wing's alleged improper use of the "Made in USA" designation in or around March 2003. Both the interrogatory and response are tied to specific factual assertions made in an August 23, 2003 letter. Rocky, however, has neglected to provide a cite to where the letter is located, if at all, in the current record. In addition, the response directly conflicts with Mr. Brooks' testimony that after he first became aware of Red Wing's alleged deceptive trade practices, he waited and watched "for quite a while" before he took action. (See Brooks Dep. p. 248). Rocky acknowledges it contacted outside legal counsel and retained investigators in March 2003. To accept March 2003 as the date when Rocky initially discovered Red Wing's alleged wrongful conduct would require the Court to disregard Mr. Brooks' uncontroverted statement that he just watched and waited "for quite a while." It is also notable that Mr. Brooks' testimony about what he knew sometime in 2001 immediately followed questions about Mr. Brooks' meetings with investigators in 2003. In this regard, Mr. Brooks was cognizant that the investigation began in 2003 when he testified that he initially learned of Red Wing's unfair competition significantly earlier.

For all of the above reasons, the Court finds that even when the evidence is viewed in the light most favorable to Rocky, the record establishes that Rocky first became aware of Red Wing's purported wrongful actions sometime in 2001. Rocky did not file the instant lawsuit until more than four years later, on April 14, 2006. Moreover, even if the Court were to accept that Rocky did not learn of Red Wing's alleged false advertising until March 2003, the action was filed more than three years later. In either scenario, the suit was filed after the analogous two-year statute of limitations had

expired. Consequently, a strong presumption arises that the delay was prejudicial and unreasonable. *Nartron*, 305 F.3d at 408; *Tandy*, 769 F.2d at 366.

## B. Overcoming the presumption

The above conclusion does not end the laches inquiry. A plaintiff may defeat the presumption of prejudice by: (1) rebutting the presumption; (2) demonstrating a good excuse for the delay; or (3) establishing the defendant engaged in conduct so egregious that it changes the balance of the equities in the plaintiff's favor. *Nartron*, 305 F.3d at 409. Rocky purports to establish all three grounds for avoiding the presumption.

## 1. Rebutting the presumption

With respect to the first method for overcoming the presumption, Rocky argues Red Wing was not unduly prejudiced by the delay in filing. Rocky maintains that Red Wing has not articulated any specific prejudice it suffered from the delay other than potential liability for increased damages.

Red Wing contends that increased exposure to liability for damages is presumptively prejudicial, citing *Nartron*. In *Nartron*, the court noted that an increase in potential damages constitutes prejudice. 305 F.3d at 411 (citing *Herman Miller v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 322 (6th Cir. 2001). The court in *Nartron* found that the potential increase of damages resulting in an eleven-year delay in bringing suit was itself sufficient to demonstrate prejudice. *Id.* at 411-12. Similarly, in *Herman Miller*, the Sixth Circuit held that the increase in damages resulting from a four-year delay in filing the action supported finding of prejudice. 270 F.3d at 322.

Rocky knew about Red Wing's alleged deceptive marketing activities in 2001. Rocky also seeks damages from Red Wing beginning in 2001. Thus, Red Wing faces

increased potential damages as a result of Rocky's delay in bringing the instant lawsuit. The Court therefore finds as a matter of law that Rocky has not rebutted the strong presumption of prejudice to Red Wing.

## 2. Excusable delay

### a. Reasonable time to protest

Rocky argues it should be afforded a reasonable time for making an out-of-court protest and waiting for Red Wing to respond. Referring to its attempt to obtain relief from the FTC, Rocky also maintains that involvement in an administrative proceeding may excuse a delay in bringing a lawsuit. In support of its argument, Rocky relies on the Restatement (Third) of Unfair Competition § 31 cmt. c (1995). Comment c. to § 31 provides in part, "reasonable time consumed in objecting to the use and awaiting the defendant's response will not contribute to a finding of laches." *Id.*; *see also* 6 *McCarthy on Trademarks and Unfair Competition* § 31:15 (2008). The reporter's note to comment c. further states, "[t]he parties['] involvement in administrative proceedings concerning the mark will ordinarily excuse a delay in filing a civil action for infringement." Restatement (Third) of Unfair Competition § 31 cmt. c, reporters' note (1995).

Red Wing points out that the authorities Rocky relies upon expressly address trademark violation, not false advertising. Moreover, Red Wing contends that Rocky's efforts to lobby the FTC do not constitute an administrative proceeding that would excuse Rocky's delay in filing. In this regard, Red Wing argues Rocky has mischaracterized its dealings with the FTC, pointing out that there is no evidence that the FTC performed an investigation, and that the FTC did not issue any official findings.

Rather, the FTC did no more than communicate information to Red Wing without even mentioning that it was Rocky that had lodged the complaint. Furthermore, Red Wing maintains that Rocky's contacts with the FTC do not excuse the delay in bringing this lawsuit because Red Wing was not included as a party to any proceeding before the FTC.

The Restatement reporters cite three decisions for the proposition that administrative proceedings may excuse delay. *Citibank, N.A. v. Citytrust*, 644 F. Supp. 1011 (E.D.N.Y. 1986); *Finance Co. of Am. v. BankAmerica Corp.*, 502 F. Supp. 593 (D.Md. 1980); *Alfred Dunhill, Inc. v. Kasser Distillers Prod. Corp.*, 350 F. Supp. 1341, *aff'd*, 480 F.2d (3d Cir. 1973). All three cases involved opposition proceedings before the Trademark Trial and Appeal Board.

Even assuming, *arguendo*, that participation in an administrative proceeding could excuse a delay in filing a false advertising claim, the Court finds Rocky's administrative proceeding argument unpersuasive. First, in each of the aforementioned cases, in contrast to the instant case, the court emphasized that the administrative proceeding provided the defendant notice of the plaintiff's intent to pursue an infringement claim. *See Citibank*, 644 F. Supp. at 1014; *Finance Co.*, 502 F. Supp. at 596; *Alfred Dunhill*, 350 F. Supp. at 1367. Thus, it is appropriate that the Restatement reporters' note speaks in terms of the involvement of the *parties* in an administrative proceeding. In the instant case, nothing in the FTC staff attorney's letter to Red Wing gave Red Wing notice that Rocky intended to pursue a false advertising claim against Red Wing. Accordingly, the Court finds, as a matter of law, that Rocky's unilateral act of contacting the FTC, without notice to Red Wing, does not comprise the sort of

administrative proceeding, with attendant notice, that would excuse a delay in the filing of this lawsuit.

From an even broader perspective, the Court has serious doubts as to whether FTC staff attorneys' review of Rocky's letter constitutes an administrative proceeding for any purpose. There is no evidence that the FTC staff attorneys performed any investigation, and they certainly issued no definite findings or conclusions. Indeed, in her letter to Red Wing, staff attorney Koss stated the staff's opinion that the use of the "Made in USA" designation in certain stores *may* give the impression that all of the shoes in the store were U.S.-made. Even this tentative opinion was qualified by language indicating that the Commission may not agree with it. For these reasons, even when the evidence is viewed in the light most favorable to Rocky, Rocky's contacts with the FTC do not constitute an administrative proceeding that would excuse the delay in the filing of the instant action.

The only remaining excuse, therefore, is the time Rocky took to make an out-of-court protest and wait for Red Wing to respond. Mr. Brooks sent a cease and desist letter to Red Wing on November 1, 2005. Red Wing responded with a letter denying wrongdoing on November 29, 2005. Thus, the entire protest and response process took about a month. Rocky first learned of Red Wing's alleged false designation of origin sometime in 2001, or at the latest in March 2003. It did not file the instant lawsuit until more than four years later, or over three years later, respectively. The brief period of time devoted to protest and response does not, as a matter of law, overcome the presumption of prejudice.

### b. Progressive encroachment

Rocky also contends the delay in filing should be excused under the doctrine of progressive encroachment. Red Wing argues that the progressive encroachment principle is limited to trademark cases, and has no applicability in a case of alleged false advertising.

"Under the doctrine of 'progressive encroachment,' a trademark owner is not forced by the rule of laches to sue until the likelihood of confusion caused by the accused use presents a significant danger to the mark." 6 *McCarthy on Trademarks and Unfair Competition* § 31:20 (2008). The Sixth Circuit Court of Appeals examined the doctrine of progressive encroachment in detail in *Kellogg Co. v. Exxon Corp*, 209 F.3d 562 (6th Cir. 2000). In *Kellogg*, the plaintiff owned the cartoon "Tony the Tiger" trademark for its breakfast cereal since 1952. Beginning in 1959, the defendant started using a cartoon "Whimsical Tiger" trademark to promote sales of its petroleum products. In the early 1990s, however, the defendant began to use the tiger trademark to promote foods and beverages at its convenience stores. The plaintiff filed suit against the defendant in 1996. In the district court, the plaintiff asserted the doctrine of progressive encroachment in response to the defendant's acquiescence defense. The district court ruled against the plaintiff on the acquiescence issue and entered summary judgment in favor of the defendant.

The Sixth Circuit reversed the district court's judgment in part, vacated it in part, and remanded the case for further proceedings. *Kellogg*, 209 F.3d at 577. The appellate court specifically vacated the district court's ruling on the plaintiff's progressive encroachment claim. *Id.*

The court in *Kellogg* began its analysis with the recognition of the dilemma facing plaintiffs in trademark infringement cases. *Id.* at 570. The Sixth Circuit likened the predicament of such plaintiffs to that of a ship attempting to "steer a hazardous course between the Scylla of laches and acquiescence and the Charybdis of premature litigation." *Id.* The court borrowed the Fourth Circuit's explanation of the quandary:

> From the time that [defendant] Kayser-Roth first introduced its Leg Looks® products, [plaintiff] Sara Lee has been on the horns of a dilemma: If [the trademark owner] waits for substantial injury and evidence of actual confusion, it may be faced with a laches defense. If it rushes immediately to litigation, it may have little or no evidence of actual confusion and real commercial damage, may appear at a psychological disadvantage as "shooting from the hip" and may even face a counterclaim for overly aggressive use of litigation.

*Id.* (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)).

For this reason, the Sixth Circuit recognizes progressive encroachment as a means of affording plaintiffs some leeway in determining when to bring a trademark infringement action. *Id.* Progressive encroachment requires the court to determine when the plaintiff could have demonstrated a likelihood of confusion, for it is from this point that the delay in filing is measured. *Id.* at 571. Likelihood of confusion, in turn, entails the examination and weighing of eight factors:

1. The strength of the mark;

2. The relatedness of the goods and services;

3. The similarity of the marks;

4. Evidence of actual confusion;

5. Marketing channels used;

6. The likely degree of purchaser care;

7. The intent of the defendant in selecting the mark; and

8. The likelihood of expansion of product lines.

*Id.* at 568 (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,

109 F.3d 275, 280 (6th Cir. 1997)). Applying these principles, the court in *Kellogg* held

that the plaintiff was not obligated to bring its lawsuit when, in 1965, the defendant

registered its cartoon tiger mark for the promotion of petroleum products only because,

at that time, it would not have been possible for the plaintiff to demonstrate consumer

confusion. 209 F.3d at 573. Rather, the time from which the delay should have been

measured was when the plaintiff became aware that defendant was using the tiger

mark to promote non-petroleum products. *Id.* at 473-74. The court explained:

> [A]t some point after registering its cartoon tiger in 1965, Exxon moved
> into the non-petroleum market of food, beverages, and retail convenience
> stores and used its cartoon tiger in connection with those sales. The point
> at which Exxon established itself in this non-petroleum market was the
> point at which Kellogg knew or should have known that it now had a
> provable claim for infringement; it was at this point that Kellogg's duty to
> defend its trademark was triggered, and it is from this point that any delay
> must be measured for purposes of determining laches or acquiescence.
> We hold that Exxon's 1965 registration was insufficient to put Kellogg on
> notice of Exxon's later use of its cartoon tiger in connection with the sale
> of non-petroleum products. The district court's failure to distinguish
> between Exxon's sale of petroleum and non-petroleum products resulted
> in the clearly erroneous conclusion that Kellogg acquiesced in Exxon's
> use of its cartoon tiger to promote any and all of its products.

*Id.*

Red Wing argues that the doctrine of progressive encroachment applies only to

trademark infringement claims. The Court agrees. As the *Kellog* decision illustrates,

likelihood of confusion is the *sine qua non* of progressive encroachment. *See also*

*Argus Research Media Group, Inc. v. Argus Media, Inc.*, 562 F. Supp.2d 260, 263 (D.

Conn. 2008) ("[T]he likelihood of consumer confusion is intimately related to a finding of

progressive encroachment."). Not surprisingly, therefore, progressive encroachment

has not been utilized to excuse a delay in filing a claim of false advertising, to which the

likelihood of confusion concept does not apply. To succeed on a claim for false

advertising under § 43(a) of the Lanham Act, a plaintiff must demonstrate:

1. The defendant made false or misleading statements of fact concerning
his or another's product;

2. The statement actually or tends to deceive a substantial portion of the
intended audience;

3. The statement is material in that it will likely influence the deceived
consumer's purchasing decisions;

4. The advertisements were introduced into interstate commerce; and

5. There is some causal link between the challenged statements and
harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. Of Podiatric*

*Surgery,* 185 F.3d 606, 613 (6th Cir. 1999). It is readily apparent that the essential

elements for a Lanham Act claim for false advertising bear little resemblance to the

factors examined to determine likelihood of confusion, and, thus, trademark

infringement. In light of this, the Court declines to do what no other court before it has

done: expand the trademark concept of progressive encroachment to encompass the

markedly different claim of false advertising.

Nonetheless, the result would be no different if the Court applied the progressive

encroachment doctrine. As a leading treatise notes:

Progressive encroachment denotes some change in direction, such as
expansion into different territories or into a different type of business. It
must be something more than a normal expansion in quantity within its

original line of business that most businesses will experience over time.

6 *McCarthy on Trademarks and Unfair Competition* § 31:20 (2008). The type of "progressive encroachment" Rocky asserts fits squarely within the realm of "normal expansion." The only change Rocky advances is that Red Wing's false advertising became more "aggressive" and that over time Red Wing added more models of shoes in the lines it produces overseas. Mr. Brooks testified that sometime in 2001, he began seeing "a consistent intentional, in my opinion, bait and switch, if you may want to call it, that's what I'll call it of China made product trying to tie into the historical Red Wing brand and made in USA." (Brooks Dep. at 248). This assertion remains Rocky's basic allegation to this day. Red Wing has been making boots and competing directly with Rocky since well before 2001. According to Rocky, since 2001 Red Wing has been using the "Made in USA" designation in a manner that suggests all of its boots are made in America. In these circumstances, even when the evidence is viewed in the light most favorable to Rocky, Rocky has not, as a matter of law, demonstrated the kind of "change in direction" in Red Wing's conduct that would excuse Rocky's delay in filing this lawsuit. From a somewhat different perspective, Rocky has not shown there was something different about the circumstances as they existed in 2001 that would have counseled against Rocky bringing the lawsuit within two years thereafter. For all of these reasons, the Court rejects Rocky's claim of progressive encroachment.

### 3. Egregious conduct

Lastly, Rocky argues it may avoid the presumption of laches because Red Wing engaged in egregious conduct. Specifically, Rocky points out that Red Wing engaged in deceptive advertising and marketing, and also sent Rocky a letter falsely claiming not

to have engaged in such conduct.

The Sixth Circuit Court of Appeals has stated that egregious conduct on the part of the defendant may shift the equities in favor of the plaintiff to the extent that the defendant may not avail itself of the equitable doctrine of laches. *Nartron*, 305 F.3d at 409. This is essentially an application of the principle of unclean hands. The Ninth Circuit Court of Appeals examined the doctrine of unclean hands as it applies to a claim of false advertising in *Jarrow Formulas, Inc. V. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002), *cert. denied*, 537 U.S. 1047 (2002). Very simply, a party with unclean hands may not claim laches as a defense. *Id.* at 841. Nevertheless, a party asserting laches need not have hands as "clean as snow." *Id.* at 842. Furthermore, the principle of unclean hands is not without its limits when applied to a claim of false advertising:

Jarrow argues that Nutrition Now acted with unclean hands because it made the challenged claims knowing they were false. In a Lanham Act false advertising suit, a plaintiff cannot ordinarily show unclean hands, and thereby defeat laches, simply by alleging that the defendant made claims knowing that they were false. *See, e.g., Hot Wax, Inc.,* 191 F.3d at 826. "To conclude otherwise would be effectively to preclude the application of laches whenever a dispute of fact regarding the merits of a Lanham Act claim existed because ... conceivably all suits involving Lanham Act claims could involve accusations of fraudulent or deceptive conduct." *Id.* A plaintiff can escape laches under the unclean hands doctrine only if the court is left with a firm conviction that the defendant acted with a fraudulent intent in making the challenged claims. *See id.* Jarrow has not come close to making such a showing in this case.

*Jarrow*, 304 F.3d at 841-42.

Turning to the case at bar, Rocky asserts two instances of purported egregious conduct on the part of Red Wing. First, Rocky relies on the conduct which forms the basis for its claims, namely, Red Wing's allegedly deceptive use of the "Made in USA." designation in connection with boots that were made overseas. As in *Jarrow*, mere

reference to Red Wing's alleged false advertising does not support a finding of unclean hands. In opposing Red Wing's summary judgment motion, Rocky has not adduced evidence from which the Court could reasonably infer that Red Wing acted with fraudulent intent. Hence, Rocky falls short of demonstrating unclean hands.

The other alleged instance of egregious conduct was Red Wing's purported assurances to Rocky in Red Wing's November 29, 2005 response to Rocky's cease and desist letter. The Court finds Red Wing's November 29, 2005 letter does not, as a matter of law, constitute the kind of egregious behavior that would preclude Red Wing from asserting laches as a defense. Significantly, Rocky filed the instant lawsuit less than five months after Red Wing purportedly assured Rocky that Red Wing was not engaged in any wrongful conduct. It is therefore apparent Rocky did not rely on Red Wing's representation. See Jarrow, 304 F.3d at 842 ("It is also significant that Jarrow was not misled by the report.").

Furthermore, Red Wing's alleged assurance came well after the analogous two-year statute of limitations had lapsed. In this sense, there is little or no connection between Red Wing's conduct and Rocky's delay in filing this action. Unclean hands must be more than conduct which is "'unrelated to the claim to which it is asserted as a defense.'" Id. (quoting Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 349 (9th Cir. 1963)). In this case, Rocky asserts unclean hands as a defense to Red Wing's claim of laches. This instance of alleged unclean hands, however, is unrelated to Red Wing's assertion of laches. As such, for this additional reason, Red Wing's purported assurance letter does not tip the balance of equities in Rocky's favor.

In sum, the Court holds that Rocky has failed to overcome the presumption of

laches as a matter of law. Consequently, Red Wing is entitled to summary judgment in its favor on Rocky's Lanham Act and ODTPA claims for damages arising before the filing of this lawsuit.

## C. Injunctive relief

Red Wing argues the Court should dismiss this action in its entirety on the basis of laches. As Rocky contends, however, laches generally bars only claims for damages which arose prior to the filing of the lawsuit. *Nartron*, 305 F.3d at 412. Laches does not preclude injunctive relief or damages arising after the action was filed unless the defendant can also demonstrate estoppel. *Id.*

> "'[T]o defeat a suit for injunctive relief, a defendant must also prove elements of estoppel which requires more than a showing of mere silence on the part of a plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark.'"

*Id.* (quoting *SCI Systems, Inc. v. Solidstate Controls, Inc.* 748 F.Supp. 1257, 1261-62 (S.D.Ohio 1990)). Although Red Wing characterizes Rocky's delay in filing as "inexcusable," Red Wing does not assert that Rocky did anything to mislead Red Wing. The Court therefore finds that Red Wing has failed to demonstrate the elements of estoppel. As a result, the Court will not apply laches to bar Rocky's claim for injunctive relief or Rocky's claim for damages arising after it filed this action.

## IV. Disposition

For the above reasons, the Court **GRANTS** Red Wing's motion for summary judgment (Doc. 66) in part and **DENIES** it in part. The Court holds that Rocky's Lanham Act and ODTPA claims for alleged damages arising before the filing of this

lawsuit are barred under the doctrine of laches. The Court will not, on the basis of laches, dismiss Rocky's Lanham Act and ODTPA claims for injunctive relief or for damages arising after the filing of this lawsuit. Furthermore, the Court will, in its discretion, exercise supplemental jurisdiction over Rocky's remaining state law claims.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**