| | | |
|---|---|---|
| ROCKY BRANDS, INC., et al., | ) | |
| | ) | **Judge Watson** |
| Plaintiffs, | ) | |
| | ) | **Magistrate Judge King** |
| v. | ) | |
| | ) | **Case No. C2 06 275** |
| RED WING SHOE COMPANY, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DAUBERT MOTION OF DEFENDANTS RED WING SHOE COMPANY, INC. AND RED WING BRANDS OF AMERICA, INC., TO EXCLUDE TESTIMONY AND REPORT OF PLAINTIFFS' EXPERT THE MANTIS GROUP, INC.

Now come Defendants Red Wing Show Company, Inc. and Red Wing Brands of America, Inc. ("Red Wing"), by and through counsel, and pursuant to Fed. R. Evid. 702, this Court's Case Management Procedures, and this Court's Trial Order dated September 29, 2009, hereby move this Court for an Order excluding from presentation at trial the Report Pursuant to Rule 26(a)(2)(B) prepared by The Mantis Group, Inc. on behalf of counsel for Plaintiffs Rocky Brands, Inc. and Lehigh Safety Shoe Company LLC ("Plaintiffs"), as well as any and all testimony or evidence related thereto. A Memorandum in Support of this Motion is attached hereto.

Respectfully submitted,

/s/ Joseph R. Dreitler

Joseph R. Dreitler (0012441)
Mary R. True (0046880)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, OH 43215
Phone: (614) 227-2300
Fax: (614) 227-2390
jdreitler@bricker.com
mtrue@bricker.com

*Counsel for Defendants*
*Red Wing Shoe Company, Inc.*
*Red Wing Brands of America, Inc.*

3394861v1

**MEMORANDUM IN SUPPORT**

## I.     INTRODUCTION

The Report prepared by The Mantis Group, Inc. (the "Survey") (Dkt. 106, Attachment 2,

Exhibit 2) and the June 5, 2008 deposition testimony of George Mantis ("Mantis Depo.") (Dkt.

106, Attachment 2) is expert opinion of the worst kind.  Not only is the Survey methodology

fatally flawed, it was conducted in a biased manner and violated the most basic principles of

survey research.  Yet despite these glaring deficiencies, Mr. Mantis nonetheless claims that the

Survey is evidence of three conclusions: (1) that the language "made in USA with imported

materials" on Red Wing's Irish Setter hunting boots is likely to lead consumers to mistakenly

believe that the boots are made in the USA; (2) that promoting the WORX brand of work boots

in association with Red Wing causes the same confusion of manufacturing origin; and (3) that a

consumer's "perception of country of origin will have a significant influence on the purchase

decision."  Survey, p. 9.  There simply is no support for the conclusions Mantis has drawn and no

excuse for the methods he used to get there.

A brief summary of the Survey is instructive.  It was conducted exclusively at gun and

knife collector shows, two each in Tennessee and Pennsylvania, in small towns less than 100

miles apart in each state.  Survey, p. 2; Mantis Depo., p. 116.  Screened respondents (383 in

total) were interviewed according to one of three questionnaire versions.  Id. at 3, 10-15.

Version 1 ("V1") showed respondents a single Irish Setter hunting boot, style 3858, with its

original tags stating "made in the USA with imported materials."  Id.; Mantis Depo., p. 132.

Version 2 ("V2") showed respondents the same style boot, but with the words "with imported

materials" covered by redacting tape, portions of the tag highlighted, and with the label inside

the boot tongue manually cut out.  Id.; Mantis Depo., pp. 144-48.  Version 3 ("V3") showed

respondents the cover page of a Red Wing/WORX catalogue bearing the image of a pair of

boots, the words "Red Wing Shoe Company, Inc." and the "Red Wing Shoes, Since 1905" and "WORX by Red Wing Shoes" logos.  Id. 4.

The survey screened out persons: under the age of eighteen; employed by (or with family in) marketing or footwear firms; who had participated in a marketing survey in the past thirty days; or who wore glasses or contacts but were without their lenses.  Id. at 2-3.  The only other criterion used to qualify respondents was a requirement that (for V1 and V2) "within the past 12 months [they] had purchased hunting boots or within the next 12 months were likely to do so," or (for V3) had purchased or were likely to purchase either "hunting or work boots" over the same period.  Id. at 2.  Respondents were then shown the stimulus and asked the following: (for V1 and V2) Question #1: "Where do you think this product is made?" or (for V3) Question #1: "Where do you think shoes from this company are made?", as well as Question #2 ("Q2") (all versions): "Why do you say that?  Anything else?"  Id. at 4.

Immediately thereafter, all respondents were then asked to assume "two brands of hunting boots…the same in every respect [except that] one…is made in the USA and the other…in another country."  Id.  They were then shown a card with Question #3 ("Q3"), which asked, "Which one of these statements describes the boot you would purchase?" and gave respondents four choices: (1) the boot "made in the USA"; (2) the boot "made in another country"; (3) no preference; or (4) don't know.  Id. at 4-5.  After answering, respondents were asked the same follow-up questions as in Q2.  The interviews were watched in real-time by a third party observer, but were not validated after completion.  Id.

As is apparent from this brief summary, the deficiencies in relevance and reliability inherent in the Survey are numerous and fatal, and each unsurprisingly skews the results wildly

in Plaintiffs' favor.[1] They include fatal universe and stimulus selection problems, leading, biased and ambiguous questions, and a complete failure to replicate marketplace conditions, just to name a few. The Court should not allow the Survey, or any evidence or testimony related thereto, to be admitted at the trial of this matter.

## II.   <u>APPLICABLE LAW</u>

The admissibility of expert testimony is governed generally by Fed. R. Evid. 702, which provides that an expert may testify only if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006). In addition, survey evidence should satisfy the following elements before it is admitted:

> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions…were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent [and unbiased] interviewers, (5) the data…was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the process was assured.

*Safe Auto Insurance Co. v. State Automobile Mutual Insurance Co.*, 2009 U.S. Dist. LEXIS 94859, *5 (S.D. Ohio 2009) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007)).

---

[1] It is worth noting at the outset that the objectivity of the entire Survey is highly questionable in light of the extensive and improper role counsel played in its design and, possibly even interpretation. See, e.g., Mantis Depo., pp. 35, 77-78. (discussing counsel's role in selection of locations and stimuli for the Survey). See also, Exhibits 1-4 attached hereto (emails showing same, as well as correspondence between counsel and Mantis sharing preliminary results of Survey events and an intent to discuss prior to finalization of the Survey). See *Yapp v. Union Pacific R.R. Co.*, 301 F. Supp. 2d 1030, 1037 (E.D. Mo. 2004) ("the heavy involvement of…counsel in the design and conduct of a survey used to guide expert statistical analyses indicates a lack of independence and thus a lack of scientific validity") (citing Federal Judicial Center, *Reference Manual on Scientific Evidence*, pp. 231-279 (2d ed. 2000)).

3394861v1

"A survey should be excluded if, after evaluating these factors, the court finds the survey irrelevant or finds that its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 2006 U.S. Dist. LEXIS 16454, *8 (E.D. Mich. 2006) (citing Fed. R. Evid. 402 & 403). In addition, "[s]urvey evidence that is so flawed that it renders the results unreliable must be excluded." *Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, 2006 U.S. Dist. LEXIS 1378, *9 (W.D. Mich. 2006). "The proponent of the survey bears the burden of establishing its admissibility." *Leelanau*, 452 F. Supp. at 778.

## III.    ARGUMENT

### A.    THE MANTIS SURVEY IS IRRELEVANT AND MUST BE EXCLUDED IN ITS ENTIRETY.

#### 1.    <u>The Survey's Universe of Respondents is Fatally Unrepresentative</u>.

The Mantis Survey used a universe of respondents so unrepresentative of the relevant market that the entire Survey is inadmissible. "Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp. 2d 734, 767 (E.D. Mich. 2003) (quoting 5 McCarthy, § 32:159 at 32-250.3). See also, *Leelanau*, 452 F.Supp. 2d at 781. In a Lanham Act case, a survey must "employ screening criteria to ensure that the universe was limited to those who were potential purchasers of the defendant's product." *Leelanau* at 782. See also, *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 571-72 (E.D. N.Y. 1999) ("the survey universe must be composed of people having a present purchasing interest in the product being surveyed"); *Leelanau* at 781-83. However, a survey will be "fatally underinclusive" if it fails to "sample 'the full range of potential [consumers] for

whom plaintiff and defendants compete." *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454, 1467 (D. Kan. 1996) (internal quotation omitted).

### a. The entire Survey universe is fatally overinclusive.

First, the Survey fails to follow the cardinal rule of universe selection by including respondents who are not potential purchasers of the products tested. Indeed, the Survey's complete failure to distinguish between past purchasers and potential purchasers of the products being tested is fatal. Survey, p. 2; *American Footwear Corp. v. General Footwear Corp.*, 609 F.2d 655, 660 n.4 (2nd Cir. 1979). Mantis specifically included past boot purchasers in the Survey, even though they are completely irrelevant to a survey of likelihood of confusion.[2] Id. See *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 604 (S.D. N.Y. 2007). Even more, the screening questions ask only about *types* of boots. They did not account in any way for specific purchasing preferences of consumers, including price point (Mantis Depo, p. 53) and typical method of purchase (e.g., internet versus retail store or shoemobile), which are essential to determining whether an interviewee is truly a potential purchaser of "the product being surveyed." *Cumberland,* 32 F. Supp. 2d at 572. This flaw makes it entirely possible that *not one* Survey respondent was truly a potential purchaser of the tested boots.

Second and equally fatal is the nonsensical failure in V3 to distinguish between hunting boot purchasers on one hand and work boot purchasers on the other. The screening question only limits respondents to those who "had purchased [or might purchase] hunting *or* work boots" during the stated time period. Survey, p. 2 (emphasis added). As a consequence, a purchaser of hunting boots who was not a potential buyer of work boots of any kind, nonetheless provided responses to a survey that was purportedly designed to test "whether and if so, to what extent

---

[2] In fact, according to the Survey, 44%, 36%, and 19% of respondents for V1, V2, and V3 respectively were unequivocally <u>NOT</u> potential purchasers even of the *category* of boot about which Mantis inquired. Survey, p. 14.

*relevant consumers* believe that the Red Wing and WORX brands of footwear are made in the United States…." (emphasis added). Hunting boot buyers are not "relevant consumers" in the work boot marketplace[3] and yet could have constituted 100% of the respondents to the questions in V3. Mantis, pp. 206-08. See, e.g., *Cumberland* at 572 (noting that screening for past "sugar-substitute" users failed to distinguish between saccharin and aspartame users, which was particularly troubling because there is "little overlap" between the two groups).

But perhaps worst of all, Mantis failed to screen for the most obvious qualifying characteristic imaginable: literacy. A survey that tests the impact of a written statement on consumer's beliefs but that fails to ensure that respondents can actually read is irrelevant.

### b. The entire Survey universe is fatally underinclusive.

The fact that the survey was taken exclusively at small town gun and knife collector shows in two states is disqualifying by itself, since "if the sample is drawn from an underinclusive universe, there is no way to know how the unrepresented members would have responded." Survey, p.2; *Winning Ways*, 913 F.Supp. at 1467 (internal citation omitted). Gun and knife show patrons represent, at best, a very narrow segment of the relevant market, and are almost certainly over-representative of the hunting population, while under-representative of the hiking and outdoorsmen populations—to say nothing of work boot purchasers—who represent a significant segment of Red Wing customers.[4] In addition, such flea market venues are certainly over-representative of male consumers[5] and older generations,[6] and are likely under-representative of racial minorities and higher income purchasers. Mantis Depo., p. 119 (no

---

[3] Red Wing and WORX brand boots are not hunting boots.
[4] Moreover, when asked to describe the shows, Mantis stated that, "what we found is that in addition to guns, many of the venues had other items for sale, which I would term to be more flea-market type items." Mantis Depo., p. 27.
[5] See, e.g., Survey, p. 14 (indicating that 98% of respondents in both V1 and V2 and 100% in V3 were male). This problem was likely aggravated by the Survey's exclusive use of two female screeners. Mantis Depo., p. 113.
[6] Id. (indicating that a plurality of respondents in both V2 and V3 were over the age of fifty).

knowledge of race or income demographics).  Moreover, there is no reason to believe that gun and knife collectors would be representative of the market for work boots in any respect, which may explain why V3 was forced to *include* potential buyers of hunting boots for the test of the WORX advertisement, lest it have no qualified respondents at all.  Survey, p.2.

Second, the Survey is fatally under-inclusive with respect to geographical representation of the relevant market.  A "survey [that fails] to examine the proper universe [including geographically]…must be discounted in its entirety…and inquiry into the integrity of the methodology is unnecessary."  *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp 1138, 1158 (S.D. Tex. 1982).  Mantis, without any scientific justification, limited his survey to four small towns in two states: Tennessee and Pennsylvania.[7]  The scope of this consumer universe is entirely too local to adequately represent the broad U.S. market for hunting and work boots.  It also is likely pre-selective of respondents with preferences for American-made products.  See, e.g., *General Motors Corp. v. Cadillac Marine & Boat Co.*, 266 F. Supp. 716, 737 (W.D. Mich. 1964) (observing the flaw of a geographically limited survey for a nationwide consumer market); Expert Report of Dr. Itamar Simonson ("Simonson"), p. 17 (Dkt. 107, Attachment 2).  Mantis did not conduct any surveys in California or Florida or Texas or New York, where there are larger, more diverse populations, different cultural norms, and consumers that would have different preferences and understandings of the stimuli presented, despite the fact that these states make up a substantial portion of the market he claims to be testing.[8]

---

[7] The gun and knife collector shows ostensibly were chosen because "it was an opportunity to efficiently screen" respondents.  Id. at 28.  However, even if true, "[t]he geographical area surveyed cannot be based on mere sampling convenience rather than upon scientific or sampling grounds."  *Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*, 383 F.3d 110, 119 (3rd Cir. 2004).

[8] Pennsylvania and Tennessee together make up only about 6.2% of the entire U.S. population, while Texas, New York, Florida and California, e.g., make up about 32.3% of the U.S. population.  See Cumulative Estimates of Population Change for the United States and States, and for Puerto Rico – April 1, 2000 to July 1, 2004, at http://www.census.gov/popest/gallery/maps/perdis_2004.html.

3394861v1

### c. Questionnaire V3 is directed at an entirely irrelevant universe of respondents.

The Mantis Survey also suffers from a particularly aggravated universe selection problem in the context of V3. Specifically, Mantis fails to distinguish between consumers of footwear on the one hand and retailers who purchase directly from Red Wing on the other. Mantis Depo., p.96-7. The WORX Questionnaire used as its stimulus a single page from a wholesale catalogue directed at and intended for distribution only to retail shoe store owners/footwear dealers. Survey, pp. 4, 24; Third Declaration of Peter D. Engel, ¶ 3 (Dkt. 114). Yet the Survey specifically defined the universe of relevant consumers to exclude anyone who was employed by or who had family members employed by "a manufacturer, distributor or retailer of any footwear." Survey, p. 3; Mantis Depo., p. 100. Thus, the WORX catalogue page, "having been limited to retailers, is inadmissible to show that in the market of ultimate consumers" the advertisement is misleading or likely to cause confusion. *American Luggage Works, Inc. v. United States Trunk Co., Inc.*, 158 F. Supp. 50, 52 (D. Mass. 1957). See also, *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 U.S. Dist. LEXIS 57320, *31 (S.D. N.Y. 2007) (discrediting a survey that used an ad "designed for viewing by [claimant's] direct, business-to-business customers…, [which] would never be encountered by…end-users, who were respondents of the [survey]").

"A survey is inadmissible when the sample is clearly not representative of the universe it is intended to reflect." *Bank of Utah v. Commercial Security Bank,* 369 F.2d 19, 27 (10th Cir. 1966)). The Mantis Survey intentionally included persons outside the relevant universe, while at the same time limiting itself to a narrow, homogeneous set of respondents most likely to give answers favorable to Plaintiffs. It is biased, utterly irrelevant and must be excluded in its entirety.

3394861v1

2.  The Survey Relies Upon Irrelevant and Improper Stimuli.

The Survey also purports to test consumer confusion with respect to stimuli that are completely irrelevant to Plaintiffs' claims. "A survey must use the proper stimulus, one that tests for confusion by replicating market conditions." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D. N.Y. 1999). In addition, altering a mark or providing only a portion of the relevant stimulus to a respondent renders a survey's results irrelevant. See, e.g., *The Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (eliciting information about an isolated part of the packaging at issue destroys relevance and credibility of survey); *Vista Food Exchange, inc. v. Vistar Corp.*, 2005 U.S. Dist. LEXIS 42541, *17 (E.D. N.Y. 2005) (because "purchasers would [never] purchase these products without the full marks on the boxes,…removing portions of them is suspect").

First, the catalogue page employed in V3 contains absolutely no designation of the manufacturing origin of the product displayed, despite the fact that Plaintiffs' claims are for false designation of origin and false advertising. It also was presented as a single page completely out of context and without the remainder of the catalogue attached. See, *Scotts*, 315 F.3d at 280. In addition to the fact that "the ultimate consumer does not have any contact" with the ad (see, *J&J Snack Foods Corp. v. The Earthgrains Co.*, 220 F. Supp. 2d 358, 372 (D. N.J. 2002)), and regardless of how interviewees responded, V3 tests nothing more than the assumptions respondents had about Red Wing and/or WORX before they were interviewed.[9] This would

---

[9] This is confirmed by the fact that only 3 out of 78 respondents to V3 relied on the content of the ad itself for their belief as to manufacturing origin, yet almost exactly the same percentage (37-39%) of respondents *in all three versions* believed the product was made in the USA. Survey, pp. 12-13. As Dr. Simonson observed, V3 may have served as an inadvertent control for V1 and V2. Simonson, p. 13. However, based on the responses in V3, what the inadvertent control reveals is "that the information [in V1 and V2] about where the Irish Setter boots were made actually had *no impact* on respondent's perceptions." Simonson, p. 14 (emphasis added).

have been clear had Mantis employed proper controls.  See, e.g., *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 448 (D. N.J. 2009) (controls are key in Lanham Act cases to screen out "publicly held preconceptions regarding the product").

In addition, V2's use of a defaced boot and tags as stimuli is disqualifying.  Survey, p.3; Mantis Depo., p. 144-48; Simonson, p. 10.  The responses of interviewees shown the defaced product cannot be considered relevant indicators of consumer confusion because they would never encounter this boot and tag combination, or any remotely like it, in the marketplace.  *Vista* at *17.  Even to the extent V2 was meant to serve only as a control for V1, its results cannot provide relevant, probative information about how respondents would perceive the labeling in the real world.  "A survey that uses stimuli that differ from what a consumer is actually likely to see in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value."  *Kargo*, 2007 U.S. Dist. LEXIS at *31.

Additionally, V1 and V2 are completely irrelevant at least with respect to over 90% of Irish Setter styles, since all but about seven out of eighty-five to ninety Irish Setter boot styles are made in China and clearly labeled that way.  Simonson, p. 10.  Thus, even if admissible, the Survey's results concerning Irish Setter boots are irrelevant to all but a few styles of footwear in total.  Mantis Depo., pp. 57-8, 62-3, 66-7, 198.  And even that's a stretch.  Mantis admitted, "I think this stimulus is fair to test *this particular boot with that particular language*," and the results cannot be extrapolated to boots "with different labeling."  Id. at 62, 66-7 (emphasis added).  See, *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1332 (N.D. Ga. 2008).

3.      Q3 Is Completely Irrelevant.

Q3, which purports to show the materiality of manufacturing country of origin in consumer boot purchasing, is utterly irrelevant to the issues presented in this case.  In a false

advertising case, a statement is material only if "it will likely influence the deceived consumer's purchasing decisions…." *American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). Materiality "require[s] proof that a potential customer would have bought the plaintiff's product had it not been for the false or misleading statements of the defendant." *Medison America, Inc. v. Preferred Medical Systems, LLC*, 548 F. Supp. 2d 567, 582 (W.D. Tenn. 2007).

First and foremost, Q3 does not even test an allegedly false statement. Instead, Mantis told respondents to *assume the fact* that one of the two hypothetically identical boots was made in the USA. Survey, p. 4. This is one more fatal flaw, because the Lanham Act requires proof not that the underlying fact is material, but that the *statement* being challenged is itself a likely influence.[10] *Medison*, 548 F. Supp. 2d at 582. The flaw is particularly aggravated in this case. None of the statements of Red Wing that are being challenged by Plaintiffs and that were tested for confusion stated simply "made in the USA."[11] More important, using a hypothetical where the allegedly material element is presented to the respondent as a fact of the world ("[o]ne of the boots *is made* in the USA") rather than the manufacturer's actual claim, completely removes from the materiality test the purchasing psychology of the consumer. Survey, p. 4 (emphasis added). What the consumer perceives to be the import of the statement, whether she believes the message, and what her understanding is of the source of the claim will all influence whether the statement is material to her purchasing decision.

Q3 is also irrelevant because it assumes precisely what it purports to prove. Respondents had no choice but to consider country of origin. Survey, p.4. By eliminating every characteristic

---

[10] For example, if a car was advertised as "made on Mars," the relevant test would be whether the *statement* is likely to have any influence on purchasing decisions; asking what preference consumers have between a car actually made on Mars and one made on Earth reveals nothing about the materiality of the allegedly false statement at issue.

[11] The unaltered Irish Setter boot in V1 included "with imported materials" language, and the WORX advertisement in V3 contained no origin language at all.

3394861v1

of a boot that consumers would consider before buying (such as price, look, fit, quality, brand loyalty, warranty, etc.), Mantis made it impossible to generate any results that show materiality in the context of actual boot purchasing. No consumer ever makes a purchase where manufacturing origin, price or any other single feature is the sole criteria for her decision. Mantis Depo., pp. 173-75 (acknowledging that he "has no information as to where country of origin ranks"). He could have asked interviewees to choose between two "widgets" and achieved the same, useless result. Mantis admitted that he has no data on "the effect of the made in the U.S.A. claim on a purchase decision." Mantis Depo., p. 172. Instead, he asserts this logical fallacy: "If a significant number of consumers believe it is [a relevant consideration], it has a [significant] influence on the purchase decision." Id. at 171, 173.

As Dr. Simonson observed, "it does not require a great deal of survey expertise to recognize that Mr. Mantis' test of materiality was fatally flawed and provided no relevant information…." Simonson at 14.

### B.  THE MANTIS SURVEY IS PATENTLY UNRELIABLE AND MUST BE EXCLUDED IN ITS ENTIRETY.

#### 1.  The Survey Fails to Approximate Market Conditions

In addition to its myriad relevance problems, the Survey lacks any probative value because of its overwhelming failure to approximate the market conditions in which consumers would encounter the products at issue. "A survey that fails to adequately replicate market conditions is entitled to little weight, if any." *Wells Fargo*, 293 F. Supp. 2d at 766. "At bottom…a survey to test the likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed [advertising] as they would in the marketplace." *Leelanau* at 783 (citing *Simon Property Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038). In addition, presenting a stimulus out of context or in a disfigured state

"sheds no light on the critical question" concerning "the consumer's reaction to the advertisement in whole and in context." *Scotts* at 280.

<strong><em>a.     The Survey fails to replicate the buying state of mind.</em></strong>

Mall intercepts are the preferred method of conducting consumer surveys. The Mantis Survey, however, was conducted in non-retail settings and completely failed to replicate the boot purchasing experience of consumers. Instead, Mantis conducted the interviews at four rural gun and knife collector shows, where not a single piece of footwear was being sold. Survey, p. 2; Mantis Depo., pp. 30, 126. Importantly, "[i]f the interviewee is not in a buying mood but is just in a friendly mood answering a pollster, his degree of attention is quite different from what it would be had he his wallet in hand. Many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash." *American Luggage*, 158 F. Supp. at 53 (D. Mass. 1957). See also, *Astatic Corp. v. American Electronics, Inc.*, 1978 U.S. Dist. LEXIS 17622, *31 (N.D. Ohio 1978) ("Voluntarily answering a few questions…calls for a different degree of attention than when a purchaser is faced with the prospect of parting with fifty dollars or more."). In addition, attendees of gun and knife collector shows bring with them assumptions about the forum that they do not bring to retail stores. E.g., it is likely that many assumed domestic companies with domestic manufacturing operations would be heavily, if not exclusively, represented. As a result, the responses are not reliable indicators of actual consumer confusion.

<strong><em>b.     The Survey fails to replicate market conditions with respect to<br>the presentation of stimuli.</em></strong>

By isolating and altering the product and advertising stimuli and presenting them entirely out of context, Mantis failed to "mirror the situation in which the ordinary person would encounter" the subject matter at issue. *Simon*, 104 F. Supp. 2d at 1038 (quoting 5 McCarthy on

Trademarks § 32:163 at 32-237 (4th ed. 1999)). First, V1 presented (1) a single boot rather than a pair (Mantis Depo., p. 132); (2) without any accompanying packaging (Id. at 49, 132); (3) and entirely in isolation (Id. at 133). At a minimum, consumers in the real world would have at their disposal other footwear as a basis for comparison, additional information on the product packaging and sales staff to question if they so desired. By failing to present the boot as it would be encountered in the marketplace, the Survey's results are of no probative value. See, e.g., *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (noting that where the materials ordinarily available to a consumer together with the product are omitted entirely and the product at issue is "viewed in isolation" by the survey respondents, the results are particularly unreliable); *Scotts* at 280; *Simon* at 1046.

In addition to the defects in V1 identified above, V2 also lacks reliability because it presented a boot in a physical condition different from how it would be encountered in the marketplace. As noted above, V2 used a defaced tag and boot combination, including redacting tape, highlighting certain words, and a manually ripped out tongue label, that fatally indicts its reliability as a test of confusion. Survey, p.3; Mantis Depo., p. 144-48; Simonson, p. 10. The impressions of respondents in V2 were almost certainly affected by the obvious material disfiguration. For example, some respondents likely (and correctly) assumed that important product information had been hidden, and as a result, they may have guessed or declined to answer. It is far more likely that respondents were confused by Mr. Mantis's bizarre defacing of the boot, not by the words ostensibly being tested.

The results of V3 are even less reliable. Not only is the WORX catalogue page an irrelevant stimulus, but it was presented entirely out of context as well. Particularly where V3 asked respondents about the origin of "shoes from this company" rather than of the specific

14

WORX footwear pictured, the entire company catalogue of different brands would be relevant to formulating a response—especially since the single page by itself is not even sent to retailers, let alone consumers. Yet even if respondents had seen the entire catalogue from which the page was taken, it was presented unaccompanied by the product or package it advertises. Since consumers will always try on shoes before making a purchasing decision, V3 bears no relationship to the real world purchasing conditions relevant to this case. See, e.g., *Leelanau* at 784 (citing *General Motors*, 266 F. Supp. 716).

2. <u>The Survey is Ambiguous and Contains Leading Questions</u>.

The Survey is littered with reliability problems due to suggestive and leading questions, as well as "demand effects" and "order effects," all of which dramatically skew the results in Plaintiffs' favor. "[S]urveys which employ leading questions or are suggestive are of limited use…." *Leelanau* at 784 (citing 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:175), since "[a] survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them." *Wells Fargo Co.*, 293 F. Supp. 2d at 768. In addition, "if the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." Shari Seidman Diamond, *Reference Guide on Survey Research* in MANUAL ON SCIENTIFIC EVIDENCE 2d at 248 (Federal Judicial Center 2000). The Survey should be excluded in this case because it was conducted in a manner that, on many levels, led respondents to an answer rather than allowing them to reveal "the message actually conveyed to consumers." *Scotts* at 280.

<em>a.</em> <strong><em>The Survey uses leading questions and ambiguous terms.</em></strong>

First, the question posed in V1 and V2 was both leading and suggestive. Respondents were shown boots with tags, both of which included the words "made in USA." They were then

asked, "Where do you think this product is made?"  It is not surprising that literate respondents would answer in a manner consistent with what they had read.[12]  But that does not reveal anything about consumer confusion or their understanding of the product's manufacturing origin—it simply shows that a respondent can read English.  See, *Simon* at 1051 ("These survey formats…test nothing more than the memory and common sense of a respondent, which show nothing probative or relevant about possible consumer confusion").  The results would likely have been identical if the boot tag said "Made in USA by Russian laborers with Chinese materials in a Mexican factory."  Simply put, "[s]urveys which do nothing more than demonstrate the respondents [sic] ability to read are not always probative on the issue of likelihood of confusion."  *Kargo* at *26 (quotation omitted).

V3 was also leading and suggestive, but for a different reason.  Respondents were shown the catalogue page, which contained no indication of manufacturing origin, and then were asked, "Where do you think shoes from this company are made?" Mantis, p. 4.  By using the ambiguous phrase "this company" in reference to an ad showing the words "Red Wing Shoe Company, Inc." as well as the "Red Wing Shoes, Since 1905" and "WORX by Red Wing Shoes" logos, Mantis established in his question precisely the connection that the survey claims to demonstrate.  See Survey, p. 9; *Wells Fargo* at 753 (noting a survey's unreliability because it described internet pop-up ads as appearing "on" a website, thereby "suggesting the association [it] was trying to establish").  By using "this company," the question did not permit respondents to distinguish among the Red Wing company, the Red Wing brand, and the WORX brand, all separately depicted on one page, and then suggested to respondents a singular manufacturing origin, both

---

[12] What *is* surprising is the fact that dramatically less than 100% of respondents answered "made in USA" for both V1 and V2. See Survey, p. 10 (indicating that only 37% of respondents in each version believed the boot to be made in the USA).  This may suggest that Mantis's failure to screen for literate respondents had a significant impact on the Survey results.

within Red Wing Shoe Company, Inc. and across its brands—the very confusion the Survey claims to show. And since almost no respondents relied on the stimulus for their answer, the results are beyond ambiguous; they are utterly meaningless. Survey, p. 12; see fn. 9, *supra*.

The serious problem of ambiguity also plagues the entire survey. Nowhere does Mantis provide any definition of the word "made" when asking the Survey questions or when referring to the Survey stimuli. Nor does he establish what respondents understood "made" to mean, either before or after questioning. Mantis Depo., pp. 136-37, 141-43. Not only does this ambiguity and lack of clarity aggravate the "reading test" problems of the Survey, but it also makes the responses uninterpretable. See, e.g., *Louis Vuitton*, 525 F. Supp. 2d at 604 ("respondents' understanding of the [ambiguous] term 'business relationship' cannot be evaluated"). Mantis cannot provide a valid interpretation of the responses because the survey "suffers from the same ambiguity as does the [advertising language] itself." *Scotts* at 279 (noting that the use of the term "prevent" in a survey to test consumer confusion based on an ad using the same language "sheds no light on the critical question" of whether consumers understood the ad to mean the product would "kill" crabgrass). See also, Mantis Depo., p. 137.

Indeed, nothing in the Mantis Survey permits the conclusion that respondents who believed that Irish Setter or WORX boots are "made in the USA" were confused,[13] because nothing in the questions or responses permits one to distinguish among various understandings of

---

[13] Importantly, Mantis has no data on consumers' actual understanding of the phrase "Made in USA" (Mantis Depo., pp. 137, 141 ), and no knowledge of the actual manufacturing origin of any brand or style of boot he tested (Id. at 54-56). Thus, Mantis's conclusions that consumers are likely to hold "*mistaken* belief[s]" or that the advertisements are "likely to cause *confusion*" (Survey, p. 9) (emphasis added) at best amount to legal conclusions about an assumed, (though not articulated), meaning of the phrase, rather than opinions of fact about consumer understanding. The conclusions are invalid as a result. See, e.g., *Pawlik v. Industrial Engineering and Equipment Co.*, 2009 U.S. Dist. LEXIS 27800, *26 (N.D. Ind. 2009) ("Experts are not allowed to testify to legal conclusion or the legal meaning of words"); *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1577-78 (Fed. Cir. 1995) (noting that in the absence of extrinsic or contextual evidence to establish a word's meaning, expert "testimony provides only conclusory legal opinions…rather than evidence of how [the] term is commonly used and understood" by the relevant persons). See also, *Bracco*, 627 F. Supp. 2d at 439-40 (experts may assume falsity for their conclusions, but are "not qualified to make an independent determination of…falsity").

what it means for a boot to be "made" in a given country. See *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 527-28 (E.D. Penn. 2007) ("What does 'made in America' mean in this context? Does it mean that every step in the manufacturing process is performed in America? Or just one step? Therein, perhaps, lies the rhetorical rub"). See also, Simonson, pp. 11-12 (stating that he is "not aware of any evidence that consumers believe that there are no imported materials or components in products described as 'made in the USA'" and concluding that the Mantis Survey "provided no pertinent information" in this respect); Mantis Depo., p. 142. This is particularly true where, as here, the respondents' explanations for the source of their belief are as ambiguous as the question itself. See, Survey, pp. 12-13. See also, *Scotts* at 279 (noting that the explanations for *why* respondents believed the product would prevent crabgrass were no clearer than the question of *whether* they believed that it would).

Confusion implies a failure to differentiate, a misunderstanding. But when respondents don't know precisely what is being asked, and when it is unclear to the expert what they mean with their answers, a survey can only test what the structure of the question implies; it can't provide probative information about whether consumers are actually confused. *Scotts* at 281.

> **b.      Q3 is leading and suffers from demand effects and order bias.**

Finally, Q3 suffers from severe demand and order effects that make its results worthless. "[D]emand effect results when the…questions [or survey design]…influence participants' responses by suggesting what the 'correct' answers might be…." *Simon* at 1048. As discussed above, different boot styles will vary in quality, both overall and with respect to particular features. By forcing respondents to assume all else equal, Mantis forced the characteristic of manufacturing origin to a level of priority (or materiality) that it otherwise would not occupy. Even more, Q3 is leading because it asks the respondent to choose between a boot "made in the

United States" and one made simply, "in another county."   Survey, p. 4.  The question clearly indicates to the respondent that the interviewer is exclusively concerned with preferences for American-made products; all other countries are indistinguishable.

In addition, because the earlier questions in the Survey always proceeded by asking respondents about the manufacturing origin of the boots they were shown, it served to prime them for later questions about the "correct" preference.  Mantis Depo., p. 71.  This suggestion of a "correct" answer was magnified because the possible answer choices to Q3 were always presented with a preference for the American-made boot listed as the first available response.  Survey, p. 4.  It is well established that, "[t]o control for order effects, the order of the questions and the order of the response choices should be rotated…"  Diamond at 255.  Instead, Mantis left the answer most favorable to Plaintiffs right at the top.

### C.     THE ENTIRE MANTIS SURVEY SHOULD BE EXCLUDED UNDER EVIDENCE RULE 403.

Regardless of whether the Court finds that the myriad fundamental flaws in the Mantis Survey render it wholly irrelevant or so unreliable as to be scientifically invalid, it must be excluded in its entirety pursuant to Fed. R. Evid. 403.  "To be probative, a survey must 'have been fairly prepared and its results directed to the relevant issues.'"  *Sterling Drug v. Bayer AG*, 14 F.3d 733, 741 (2nd Cir. 1994) (quoting *Universal City Studios*, 746 F.2d at 118 (quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651, 657 (W.D. Wash. 1982)).  Where "the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial."  *Simon* at 1039.  Fed. R. Evid. 403.

The substantial flaws inherent in the Mantis Survey make clear that its probative value is so minimal as to warrant exclusion.  A survey that is nothing more than a "memory test" is

properly excluded, since "the slight probative value [is] outweighed by its prejudicial affect under Rule 403," and "its potential to confuse the issues in the case." *Starter Corp. v. Converse, Inc.*, 170 F. 3d 286, 297 (2nd Cir. 1999).  No jury could account for the Survey's myriad flaws, but even if it could, the Survey would be accorded so little evidentiary weight that its introduction and Mr. Mantis's testimony would be, at best, a complete waste of the Court's time. The greater risk and more certain result is that introduction of the Survey would unfairly prejudice Red Wing, cause substantial confusion and mislead the jury with respect to critical issues in the case.  "Where a trademark action contemplates a jury trial…the court should scrutinize survey evidence with particular care." *Kargo* at *33.  Excluding survey evidence from trial is *most important* when its flaws run the risk of misleading the jury.  See, e.g., *Sears, Roebuck & Co. v. Menard, Inc.*, 2003 U.S. Dist. LEXIS 951, *10-11 (N.D. Ill. 2003).

Admitting into evidence a biased survey based on such unreliable data and submitted as evidence of wholly unsupported conclusions of the most critical importance to this case would be misleading, confusing, and unfairly prejudicial to a degree far beyond any imaginable probative value that the Survey could possess.  It must be excluded.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Red Wing respectfully requests that the Report Pursuant to Rule 26(a)(2)(B) prepared by The Mantis Group, Inc. on behalf of counsel for Plaintiffs, and any testimony or evidence related thereto, be deemed inadmissible and excluded in its entirety from the trial of this matter.

3394861v1

Respectfully submitted,

/s/ Joseph R. Dreitler
Joseph R. Dreitler (0012441)
Mary R. True (0046880)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, OH 43215
Phone: (614) 227-2300
Fax: (614) 227-2390
jdreitler@bricker.com
mtrue@bricker.com

*Counsel for Defendants*
*Red Wing Shoe Company, Inc.*
*Red Wing Brands of America, Inc.*

3394861v1

**CERTIFICATE OF SERVICE**

The foregoing document was filed and served this 13th day of November 2009, upon counsel of record via the Court's electronic filing and notification system. Copies of this document and all attachments and exhibits may be accessed through the Court's electronic filing system.

/s/ Joseph R. Dreitler

Joseph R. Dreitler